UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| William Andreoli, | Case No.: 16-cv-02922-BTM-JLB |
| Plaintiff, | **ORDER GRANTING IN PART DEFENDANTS' MOTION FOR RULE 37(b) SANCTIONS** |
| v. | |
| Youngevity International, Inc., et al., | |
| Defendants. | |
| | **[ECF No. 160]** |

Before the Court is Defendants' Motion for Sanctions pursuant to Federal Rule of Civil Procedure 37(b). (ECF No. 160.) Defendants seek sanctions for Plaintiff's failure to comply with the Court's Order granting Defendants' Motion to Compel. Plaintiff opposes Defendants' motion. (ECF No. 162.) For the reasons discussed below, Defendants' motion is **GRANTED in part and DENIED in part**.

## I.     BACKGROUND

Defendants claim that Plaintiff has participated in a pattern of discovery misconduct, as evidenced by Plaintiff's failure to abide by this Court's December 5, 2019 Order granting Defendants' Motion to Compel ("the Order") (ECF No. 121). The Order required Plaintiff to produce all documents responsive to Defendants' Requests for Production ("RFPs") 234 and 237–255 by January 4, 2019. (*Id.* at 18; *see* ECF No. 79-2 at 9–11.)

1

These RFPs seek communications, including text messages, between Plaintiff and eighteen "key individuals" between January 1, 2015, and July 1, 2016. (ECF Nos. 79 at 8; 79-2 at 9–11.)

Pursuant to the Order, Plaintiff made a supplemental production of documents on January 4, 2019, but the production did not include any text messages. (ECF No. 152-2 ¶ 4.) After meeting and conferring, which included pledges from Plaintiff that all responsive text messages had been produced, Plaintiff agreed to make a second supplemental production on February 12, 2019.[1] (*Id.* ¶ 14.) Plaintiff characterized the February 12 production as a single production of every responsive text message already produced in the case—or in other words—all responsive text messages in his possession. (*See* ECF No. 156-2 ¶ 9.) However, Defendants estimated that the February 12 production contained hundreds of text messages not previously produced. (ECF No. 157-2 ¶ 12.) Further, despite the hundreds of newly-produced text messages, Defendants remained concerned that Plaintiff still had not produced all responsive text messages because the production lacked one-on-one texts between Plaintiff and eight key individuals identified by the RFPs. (ECF No. 152-2 ¶ 25.)

After further meet and confer efforts, Defendants were unable to confirm whether Plaintiff had produced all responsive text messages. (*Id.* ¶ 26.) Accordingly, on March 8, 2019, Defendants filed a Motion to Reopen Discovery (the "Verizon Motion") wherein they requested leave to subpoena Verizon Wireless for Plaintiff's text message logs. (ECF No. 152.) In their motion, Defendants voiced several concerns regarding Plaintiff's February 12 production, including an apprehension as to whether all responsive text messages had been produced, despite Plaintiff's assurances otherwise. (*Id.* at 2.) Defendants also voiced suspicions that Plaintiff's February 12 production included text

---

[1] A more detailed recitation of parties' meet and confer efforts related to Plaintiff's January 4 and February 12 supplemental productions is set forth in the Court's Order granting Defendants' Motion to Reopen Discovery (the "Verizon Order") and will not be repeated here. (*See* ECF No. 161 at 1–4.)

messages sourced from other custodians' cell phones based on the duplicate and triplicate text messages in the production. (*Id.* at 5.) Defendants further argued that the text messages did not contain any metadata, such as a custodian field, which would confirm the text messages' sources. (*Id.*)

In his opposition to the Verizon Motion, Plaintiff conceded that despite previously believing—and representing to Defendants on multiple occasions—that all text messages produced on February 12 were sourced solely from his cell phone, the production did include text messages sourced from other custodians' cell phones. (ECF No. 162-2 ¶ 13.) However, Plaintiff once again contended that all responsive text messages had nevertheless been produced and that the Verizon subpoena was therefore futile. (ECF No. 156 at 5–6.) In support of this position, Plaintiff provided five text messages as examples of "one-on-one" text messages between himself and three of the eight key individuals. (*See* ECF No. 156-2 at 7–11.)

In reply, Defendants' argued that the purported one-on-one text messages appeared to be group text messages when taken in context with other produced text messages. (ECF No. 157 at 4–7.) This flagged for Defendants that the headers on the text messages—which presented the messages as one-on-one communications—were unreliable. Defendants further asserted that Plaintiff had not produced all responsive text messages, as evidenced by a screenshot of a one-on-one text message between Plaintiff and Maxandra Desrosiers, one of the eight key individuals. (*Id.* at 3; ECF No. 157-3 at 10.) Plaintiff had not produced this text message or any other one-on-one text messages between himself and Desrosiers. (ECF No. 157 at 3.)

On April 10, 2019, the Court granted Defendants' Verizon Motion and reopened discovery for the limited purpose of issuing a subpoena on Verizon for Plaintiff's text message logs. (ECF No. 161.) The Court found that the produced text messages' headers—which contained important metadata such as sender, recipient(s), and date and time sent—were misleading and unreliable. (*Id.* at 12.) In light of the unreliability of the header information, the Court expressed that it found it troubling that Plaintiff had

3

produced text messages that were imaged from cell phones other than his own. (*Id.*) Having found that the unreliability of the header information was sufficient to warrant the Verizon subpoena, the Court declined to address Defendants' argument that Plaintiff had not produced all responsive text messages in his possession. (*Id.* at 13 n.7.)

On March 27, 2019, while the Verizon Motion was pending, the parties further met and conferred telephonically regarding the deficiencies with Plaintiff's February 12 text message production. (ECF No. 160-2 ¶ 3.) During the call, Defendants "asked Plaintiff to correct the text message production by either (a) providing metadata for the text messages Plaintiff previously produced, or (b) . . . completing a new production containing only text messages sourced from Plaintiff's device," but Plaintiff declined both options. (*Id.* ¶ 4.) Defendants then stated that they "might agree to pay the costs associated with the new production or the [reimaging] of Plaintiff's device," but Plaintiff likewise declined that offer. (*Id.*)

Defendants bring the instant Motion for Sanctions against Plaintiff pursuant to Federal Rule of Civil Procedure 37(b). (ECF No. 160.) Defendants argue that Plaintiff has failed to comply with the Court's Order granting Defendants' Motion to Compel and requiring Plaintiff to produce, *inter alia*, all text messages responsive to RFPs 234 and 237–255. Specifically, Defendants argue that Plaintiff has disobeyed the Order because he has failed to produce: (1) text messages in native format with metadata; (2) text messages within his possession, custody, or control; and (3) all responsive text messages. (*Id.* at 7.)

As to sanctions for Plaintiff's violations, Defendants request that the Court order Plaintiff, at his expense, to produce the corrupted image of his cell phone for examination by Defendants' forensic expert (or a court-appointed neutral) and order a new image. (ECF No. 165 at 2–3.) Defendants also request monetary sanctions comprised of reasonable expenses and attorneys' fees for various litigation efforts. (*Id.* at 2–3, 6.)

///

///

///

## II.  DISCUSSION

**A.  Legal Standards**

### 1.  Sanctions Under Rule 37(b)

Federal Rule of Civil Procedure 37(b) authorizes sanctions against a party for failing to obey a discovery order.  Fed. R. Civ. P. 37(b)(2)(A), (C).  As indicated by the language of Rule 37(b), a court has discretion whether to issue sanctions, and if so, what types of sanctions to issue.  *Von Brimer v. Whirlpool Corp.*, 536 F.2d 838, 844 (9th Cir. 1976) ("By the very nature of its language, sanctions imposed under Rule 37(b) must be left to the sound discretion of the trial judge."); *accord Liew v. Breen*, 640 F.2d 1046, 1050 (9th Cir. 1981) ("Imposition of sanctions under Rule 37(b), and the selection of the particular sanction, are matters left to the discretion of the trial court."); *Robinson v. City of San Diego*, No. 11–CV–0876–AJB (WVG), 2013 WL 525679, at *6 (S.D. Cal. Feb. 8, 2013) ("Under Rule 37, the Court has wide discretion to fashion remedies for disobeying discovery orders.").  However, the district court's discretion to issue sanctions is subject to the following limitations: (1) the sanction must be just; and (2) the sanction must specifically relate to the particular claim at issue in the discovery order.  *Navellier v. Sletten*, 262 F.3d 923, 947 (9th Cir. 2001) (citing *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982)).[2]

Rule 37(b)(2)(C) also provides that with respect to payment of expenses for failure to comply with a court order, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C).

---

[2] Terminating sanctions, which are not sought here, require an additional finding that the "failure to comply is due to willfulness, bad faith, or fault of the party," and are only appropriate in "extreme circumstances."  *Fjelstad v. Am. Honda Motor Co.*, 762 F.2d 1334, 1338 (9th Cir. 1985); *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1983) (citing *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 640 (1976)).

## 2. Sanctions Under the Court's Inherent Power

A district court also has the inherent power "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962). Civil Local Rule 83.1(a) provides that the district court has the discretion to impose "any and all sanctions authorized by statute or rule or within the inherent power of the court, including, without limitation, dismissal of any actions, entry of default, finding of contempt, imposition of monetary sanctions or attorneys' fees and costs, and other lesser sanctions," for the failure of counsel, or of any party, to comply with the Court's Local Rules, with the Federal Rules of Civil or Criminal Procedure, or with any order of the court. *See* CivLR 83.1(a).

## B. Noncompliance with the Court's Order

### 1. Plaintiff's Failure to Produce Text Messages with Reliable Metadata

Defendants first argue that Plaintiff failed to comply with the Court's Order by producing text messages that "were not in native format and contained no metadata." (ECF No. 160 at 7.) Specifically, Defendants take issue with the produced text messages' lack of custodian metadata. (*Id.* at 8.) Without such data, Defendants argue that they cannot confirm whether any of the produced text messages were sourced from Plaintiff's cell phone. (*Id.*)

Concerning Plaintiff's ability to produce custodian metadata, Defendants attached to their motion the declaration of Michael Kunkel, the Director of Investigative Services of Setec Security Technologies, Inc. (ECF No. 160-1; *see* ECF No. 157-1 ¶ 2.) In his declaration, Mr. Kunkel states that Cellebrite, the program used to image Plaintiff's cell phone, has the capability of creating a "workbook" for the device in Excel. (ECF No. 160-1 ¶ 6.) One such sheet, or "overlay," of the workbook can include different columns of metadata, such as "sender, recipient(s), date and time sent, date and time read or received, whether content was deleted (Yes or No), and the custodian or source device." (*Id.* ¶ 8.) Another sheet of the workbook can display device information data, including "the name of the owner of the device." (*Id.* ¶ 9.) Mr. Kunkel opines that Plaintiff's production "did

not include all metadata that is retrievable and available through the Cellebrite software." (*Id.* ¶ 10.)

In response, Plaintiff argues that the Court's Order makes no reference to metadata, but nevertheless, all available metadata was produced. (ECF No. 162 at 5.) Plaintiff attached to his opposition the declaration of Lane Perkins, project manager for Plaintiff's ESI Vendor. (ECF No. 162-2.) In his declaration, Mr. Perkins agrees with Mr. Kunkel that Cellebrite "has the capacity to upload into an Excel format." (*Id.* ¶ 6.) However, Mr. Perkins provides that this process would make "searching and producing individual text messages impossible in practice as all text messages are contained" in a single Excel file. (*Id.*) Instead, Plaintiff produced his text messages using Cellebrite's individual upload function, "which is also a common practice." (*Id.*) For support, Mr. Perkins provides that this individual process was also used to produce text messages in the Concurrent Case, *Youngevity International, Corp. v. Smith et al.*, 16-cv-00704-BTM-JLB (S.D. Cal.) ("Concurrent Case"). (*Id.*) Mr. Perkins further states that "[a]dditional metadata for text messages is not typically required as such information is contained and produced in each text message itself." (*Id.*)

To their reply, Defendants attached a second declaration from Mr. Kunkel, wherein Mr. Kunkel contends that Plaintiff could have produced the text messages in the individual, searchable format "while concurrently producing an Excel sheet containing the metadata for those text messages." (ECF No. 165-1 ¶ 4.)

The Court agrees with Plaintiff that the Order did not specifically reference metadata. However, the Order stated that Plaintiff "shall produce all documents responsive to RFPs 234 and 237–255 on or before January 4, 2019." (ECF No. 121 at 18.) The instructions in Defendants' RFPs required Plaintiff to produce all documents "in native formats with metadata preserved." (ECF No. 79-2 at 6.) Thus, the Court ordered production of responsive documents as requested, and that request included the preservation of metadata. Therefore, Defendants' argument that the Court's Order required the production of metadata is not without merit.

However, Defendants' characterization of Plaintiff's production as without metadata is overstated. Defendants are correct that Plaintiff's production did not include custodian metadata or Cellebrite reports. But, as evidenced by the text messages Defendants attached as exhibits to their Verizon Motion, the produced text messages each included a header containing the sender, recipient(s), and date and time sent. (*E.g.*, ECF No. 152-3 at 70–102.)

Concerning the method in which Plaintiff produced metadata, the Court declines to find that Plaintiff violated the Order by opting for one format of metadata production over another. Although Defendants' ESI vendor states that it was *possible* for Plaintiff to have produced Cellebrite reports in Excel containing custodian information, Defendants' RFP instructions did not specifically request that metadata be produced in this manner. Further, Plaintiff's ESI vendor states that Plaintiff's individual production method is commonplace and is the method accepted by the parties in the Concurrent Case. Defendants' ESI vendor does not rebut either of these two points.

Nevertheless, as already determined by the Court, the header content—or metadata—that Plaintiff produced was misleading and unreliable.[3] Defendants' RFP instructions requested that responsive text messages be produced with metadata preserved, and by producing text messages with misleading header content, Plaintiff failed to do so. Accordingly, the Court finds that Plaintiff's production of unreliable metadata did not comply with the Court's Order.[4]

///

///

///

_____

[3] In the Verizon Order, the Court discussed how the duplicate and triplicate text messages that Plaintiff produced concerningly did not list identical recipients in their headers. (ECF No. 161 at 12.) Further, the Court noted how the text messages that Plaintiff alleged to be one-on-one communications appeared to be group text messages when taken in context with other text messages. (*Id.* at 11–12.)

[4] Defendants mention in passing that their RFP instructions also required Plaintiff to produce documents in native format but do not substantiate any argument regarding the file format of Plaintiff's text messages.

2. <u>Plaintiff's Production of Text Messages Outside of His Possession, Custody, or Control</u>

Defendants also contend that Plaintiff's inclusion of text messages imaged from other individuals' cell phones violated the Court's Order. (ECF No. 160 at 7.) Defendants provide that their RFP instructions required Plaintiff "to produce documents only within his 'possession, domain, custody, or control,'" but Plaintiff produced text messages from other individuals' devices. (*Id.* (quoting ECF No. 79-2 at 5).)

Defendants argue that Plaintiff "repeatedly claimed" during the parties' meet and confer process after the February 12, 2019 production "that each text message produced on February 12th was sourced directly from his device." (*Id.* at 5 (citing ECF No. 152-2 ¶ 26).) Yet, as discussed by Defendants in their Verizon Motion, Plaintiff's production of duplicate and triplicate text messages with unidentical recipients "indicated otherwise,"[5] and Plaintiff "was forced to concede that the messages were not sourced [solely] from his own device." (*Id.*) By way of explanation, Plaintiff's vendor detailed a deduplication process in which the text messages from Plaintiff's cell phone that were duplicative of those already contained in the Concurrent Case's text message database were deleted from the database.[6] (*Id.* at 9.) Defendants argue that it was improper for Plaintiff "to delete . . . device-specific information[] or commingle the documents in this case" with the Concurrent Case. (*Id.*)

In response, as in his opposition to the Verizon Motion, Plaintiff admits that some of the produced text messages were sourced from other individuals' devices in the

---

[5] As detailed in the Verizon Order, Plaintiff's February 12 production included duplicate and triplicate versions of the same text messages, but each text message contained slightly different information in the headers, such as the way contact names were spelled, if a contact was identified solely by a phone number, and a lack of uniformity in recipients. (ECF No. 161 at 6, 11–12.)

[6] As detailed in the Verizon Order, this deduplication process removed "any identical copies of text messages" from the database such that "only one unique copy of each text message remained in the database." (ECF No. 156-1 ¶ 4.) Because Plaintiff's cell phone "was one of the last devices imaged" in the Concurrent Case, "any text messages on [Plaintiff]'s device that had an identical copy located on any of the earlier devices" were "removed from the database." (*Id.*)

Concurrent Case. (ECF No. 162 at 6.) However, Plaintiff reiterates that when production occurred on February 12, 2019, he believed that all text messages were sourced solely from his cell phone. (*Id.*) Plaintiff argues that his production of text messages "should not be construed as a violation of the Court's Order because [he] has at all times attempted to provide complete productions and responses to [Defendants'] requests." (*Id.* at 6–7.) Furthermore, Plaintiff contends that he complied with the Court's Order because the messages he produced "were in the possession of [his] counsel and ESI vendor, were to and from [him], were responsive to the requests, and were produced." (*Id.* at 6.)

The Court disagrees with Defendants on this point. Plaintiff's inclusion of text messages from multiple devices is a problem, in light of the misleading header information and Plaintiff's repeated and incorrect assurances that all of the text messages produced were from his device. And, as addressed in the next section, Plaintiff's failure to produce all responsive documents is also a problem. Defendants' argument that Plaintiff violated the Court's Order by producing responsive documents sourced from the cell phones of others because those documents were not within Plaintiff's possession, custody, or control, is unpersuasive. The documents produced clearly were within Plaintiff's possession, custody, and control, even if they were not sourced from his cell phone. Therefore, the Court finds that Plaintiff's inclusion of text messages from other custodians' devices in his production was not, in itself, a violation of the Court's Order.

3. Plaintiff's Failure to Produce All Responsive Text Messages

Finally, and most significantly, Defendants argue that Plaintiff has failed to comply with the Court's Order because he has not produced all responsive text messages. (ECF Nos. 160 at 7–8; 165 at 3.)

In his opposition, Plaintiff concedes that he has not produced all responsive text messages. (ECF No. 162 at 2.) However, Plaintiff argues that he and his ESI vendor were unaware of his failure to fully produce until Defendants filed their reply to the Verizon Motion on March 20, 2019, which included a screenshot of a responsive, yet unproduced,

text message between himself and Maxandra Desrosiers (the "Desrosiers text").[7]  (*Id.* at 2; *see* ECF No. 157-3 at 10.)  Plaintiff provides in his own declaration that on April 4, 2019, he searched his old cell phone and "for the first time realized that it contained the apparently unproduced [Desrosiers] text message" in addition to other responsive-yet-unproduced text messages between himself and Desrosiers.  (ECF No. 162-1 ¶ 8.)  Prior to discovering the Desrosiers text, Plaintiff states that "neither [he] nor his counsel had any indication that any specific messages had not been produced."  (ECF No. 162 at 2.)  Because the image of Plaintiff's device is now corrupted, Plaintiff's ESI Vendor cannot verify why responsive text messages between Plaintiff and Desrosiers were not produced.  (*Id.*; *see* ECF No. 162-2 ¶¶ 10–11.)  Plaintiff further contends that there have been "technological challenges" in producing his text messages in this case, and discovery in this case has been complicated by the Concurrent Case.  (ECF No. 162 at 2.)

In reply, Defendants argue that "there remains no dispute" that Plaintiff violated the Court's Order by failing to produce all responsive text messages.  (ECF No. 165 at 3.)  Defendants contend that, since August 2018, they have "consistently raised" concerns about Plaintiff's failure to produce one-on-one text messages with specific individuals.  (*Id.* at 5.)  Because "Plaintiff knows whether he exchanged text messages with" the specific individuals identified in the RFPs, "the absence of those messages [from his productions] should have been a clear indication that his productions were incomplete."  (*Id.*)  As such, Defendants argue that Plaintiff has not taken "reasonable measures to comply with this Court's Order."  (*Id.* at 2.)

The Court finds that Plaintiff's failure to produce all responsive text messages, even if unintentional, violated the Court's Order.  Although the Federal Rules of Civil Procedure "do not demand perfection," "[t]he discovery process relies upon the good faith and

---

[7] The Court notes that the screenshot does not identify the sender of the text message nor the date of the conversation.  However, Plaintiff confirmed in his declaration that the text message is a responsive text between Plaintiff and Desrosiers.  (ECF No. 162-1 ¶¶ 8–9.)

16-cv-02922-BTM-JLB

professional obligations of counsel to reasonably and diligently search for and produce responsive documents." *Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 615 (C.D. Cal. 2013) (quoting *Smith v. Life Inv'rs Ins. Co. of Am.*, No. 2:07–cv–681, 2009 WL 2045197, at *5 (W.D. Pa. July 9, 2009)). Through much of this litigation, Defendants have argued that Plaintiff's document production has been inadequate and have expressed concerns that Plaintiff has not performed a reasonably diligent search for all responsive text messages. Plaintiff was first put on notice of the possibility that text messages between himself and the individuals identified in the RFPs were not included in his productions in August 2018. Defendants further alerted Plaintiff to his productions' deficiencies in January and February 2019, and yet Plaintiff continued to rely on his vendor's representations that all responsive text messages had been produced.

Plaintiff argues that prior to discovering the Desrosiers text, "neither [he] nor his counsel had *any indication* that any specific messages had not been produced," and that he had "produced all responsive text messages to the best of his knowledge." (ECF No. 162 at 2, 7 (emphasis added).) Although Defendants did not present direct evidence of a responsive-yet-unproduced text message until March 2019, as Defendants argue, Plaintiff presumably knew whether he had one-on-one text message conversations with the eight individuals whose text messages Defendants allege were still missing from the February 12, 2019 production. The fact that Plaintiff's February 12 production did not include ***any*** one-on-one text messages with eight individuals—when it was characterized as a single production of all responsive text messages—should have further alerted Plaintiff to at least the possibility that text messages were missing from his productions and that his vendor's current search was inadequate. Instead, Plaintiff continued to rely on his vendor's representations without further investigation[8] that all text messages had been produced

---

[8] As Plaintiff admits in his declaration, he has access to his old cell phone, and therefore, he could have conducted a reasonable search at any time as to whether one-on-one communications between himself and the eight individuals in question exist in the requested time period.

until he was confronted with tangible, contradictory evidence.  In sum, Plaintiff repeatedly represented to Defendants and the Court that he had produced all responsive text messages only to now reveal that he failed to produce text messages he should have been aware existed and would have been aware existed after a reasonably diligent search.

Further, Plaintiff's use of the Concurrent Case's deduped text message database is no excuse for his failure to produce his own text messages.  The Court recognizes that the parties specifically modified the Protective Orders in this case and the Concurrent Case to avoid duplicative discovery between cases.  (ECF Nos. 78, 80.)  And the Court is not unsympathetic to the technological difficulties Plaintiff has faced.  Yet, it is Plaintiff who initiated *this* case, and therefore, his argument that the Court and Defendants should accept his deficient production because of complications stemming from the Concurrent Case rings somewhat hollow.  As Defendants argue, it is Plaintiff's text messages that matter "not those of non-parties with no production obligations."[9]   (ECF No. 160 at 9.) Accordingly, the Court finds that Plaintiff's failure to produce all responsive text messages, regardless of why, violated the Court's Order.

## C.    Appropriate Sanctions

As discussed above, the Court finds that Plaintiff failed to comply with the Court's Order by failing to produce reliable metadata and all responsive text messages.  Plaintiff argues that sanctions are not warranted because his noncompliance was unintentional and without bad faith.  (ECF No. 162 at 2, 7.)  However, sanctions are permissible under Rule 37(b) when a party fails to comply with a court order regardless of the reasons.  *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 208 (1958) ("Whatever its reasons, petitioner did not comply with the production

---

[9] Defendants also raise spoliation concerns, arguing that the deduplication process eliminated information concerning which text messages were on Plaintiff's device when it was imaged.  (ECF No. 160 at 9.) Plaintiff in response argues that Defendants have presented no evidence of spoliation and includes in a declaration attached to his opposition that he did not delete any responsive text messages.  (ECF Nos. 162 at 7; 162-1 ¶ 4.)  The Court acknowledges Defendants' spoliation concerns but finds them speculative and premature at this time.

order. Such reasons, and the willfulness or good faith of petitioner, can hardly affect the fact of noncompliance . . . .").  Indeed, sanctions pursuant to Rule 37(b) may be imposed for negligent conduct.  *Fjelstad*, 762 F.2d at 1343 ("We have consistently held that sanctions may be imposed for negligent failures to provide discovery."); *David v. Hooker, Ltd.*, 560 F.2d 412, 420 (9th Cir. 1977) ("[I]n view of the possibility of light sanctions, even a negligent failure [to obey an order] should come within [Rule 37(b)].").  Here, Plaintiff failed to comply with the Court's Order in two different respects, and thus, the Court determines that sanctions are warranted.

As stated above, "[i]n order for the sanction to comport with due process, the sanction imposed under Rule 37 must be specifically related to the particular claim which was at issue in the order to provide discovery." *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1412 (9th Cir. 1990) (citing *Fjelstad*, 762 F.2d at 1342); *see Navellier*, 262 F.3d at 947.  Rule 37 also requires that the sanction must be "just." *Ins. Corp. of Ireland, Ltd.*, 456 U.S. at 707.  Although a party's good or bad faith in noncompliance is not relevant for purposes of initially determining whether or not to impose non-terminating sanctions, a court may consider it when determining the severity of the sanctions. *See Societe*, 357 U.S. 197, 208 (1958) ("[T]he willfulness or good faith of [a party] can hardly affect the fact of noncompliance and [is] relevant only to the path which the District Court might follow in dealing with [the party's] failure to comply."); *Hyde & Drath v. Baker*, 24 F.3d 1162, 1171 (9th Cir. 1994) ("[Although] a finding of bad faith is not a requirement for imposing sanctions, good or bad faith may be a consideration in determining whether imposition of sanctions would be unjust."); *see also Chicult v. United States*, 4 F.3d 1313, 1322 n.23 (5th Cir. 1993) (citing *Societe* for the proposition that "the type of conduct displayed by a party ha[s] no bearing on whether sanctions should be imposed, but only on the type of sanctions imposed").  Therefore, the Court takes into consideration Plaintiff's argument that his noncompliance was not deliberate or in bad faith when determining what sanctions are appropriate here.

*///*

14

1.    Reimaging Plaintiff's Cell Phone

In their motion, Defendants first request that the Court: (1) require Plaintiff to produce the corrupted image of his cell phone to Defendants' forensic data expert, or a court-appointed neutral; or (2) order a court-appointed neutral to create a new image of his cell phone, if the current image is corrupt beyond repair. (ECF No. 160 at 11.) Plaintiff in opposition states that he "is in the process of having [his] device reimaged by another third party to identify any responsive text messages that have not been produced," and "[t]o the extent any such messages exist, [he] and his counsel will be producing them." (ECF No. 162 at 2–3.) In reply, Defendants argue that Plaintiff "cannot be trusted to fulfill his discovery obligations regarding text messages," and therefore, the Court should require Plaintiff to "produce the corrupt image of data *and* his device" to Defendants. (ECF No. 165 at 2 (emphasis added).)

The Court finds that the reimaging of Plaintiff's cell phone at his expense is an appropriate discovery sanction, as it is specifically related to Plaintiff's noncompliance. Creating a new image of Plaintiff's cell phone, given that the current image is corrupted, will help ensure that all responsive text messages are accurately produced and is therefore, just under the circumstances. Moreover, Plaintiff has already agreed to employ Aptegra Consulting, an independent forensic consultant, to reimage his cell phone. (ECF No. 162-2 ¶ 15.)

The Court is satisfied with Plaintiff's approach and declines to order Plaintiff to turn over his cell phone or the corrupted image to Defendants' forensic expert for inspection or otherwise appoint a third-party neutral.[10] However, given Plaintiff's inability to produce all responsive text messages thus far, the Court has concerns about Plaintiff unilaterally determining the appropriate reimaging process.[11] The parties shall instead meet and confer

---

[10] Defendants do not object to Aptegra Consulting as a possible neutral, third-party vendor in their reply.
[11] Plaintiff's ESI vendor provides in his declaration that Aptegra Consulting will extract text messages from Plaintiff's device and then provide the text messages to Plaintiff in Law PreDiscovery, "so

to identify a mutually-agreeable plan for the reimaging of Plaintiff's cell phone, including the manner and format in which responsive text messages will be produced.

Accordingly, Defendants' request that Plaintiff produce his cell phone and its corrupted image to Defendants or a court-appointed neutral for inspection and reimaging is **DENIED**.

2. <u>Monetary Sanctions</u>

Defendants also request an award of monetary sanctions comprised of reasonable expenses and attorneys' fees incurred from: (1) reviewing Plaintiff's January 4 and February 12 productions; (2) meeting and conferring on the January 4 and February 12 productions; (3) drafting the Verizon Motion; and (4) drafting the instant sanctions motion. (ECF No. 165 at 6.) The Court finds that Defendants are entitled to monetary sanctions under Rule 37(b)(2)(C), but not to the extent requested.

*a. Monetary Sanctions Under Rule 37(b)(2)(C)*

As stated above, Rule 37(b)(2)(C) provides that with respect to payment of expenses for failure to comply with a court order, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, *caused by the failure*, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C) (emphasis added). Here, the Court finds that the reasonable expenses and attorneys' fees that were caused by Plaintiff's failure to produce all responsive text messages are only those expenses and fees incurred from: (1) meet and confer efforts after the February 12, 2019 production; and (2) bringing the instant sanctions motion.[12]

---

[Plaintiff]'s counsel can review and produce any responsive text messages to the extent any exist that were not previously produced." (ECF No. 162-2 ¶ 15.)

[12] The Court finds that Defendants' meet and confer efforts related to Plaintiff's January 4 production and review of the January 4 and February 12 productions were not caused by Plaintiff's noncompliance. Plaintiff may not have produced any text messages on January 4, but he presumably produced other responsive documents. Likewise, Plaintiff produced hundreds of text messages for the first time on February 12 as the result of meet and confer efforts related to the January 4 production. Defendants would

16-cv-02922-BTM-JLB

Although Plaintiff argues that his failure to produce all responsive text messages was not in bad faith or intentional, the Court finds that Plaintiff did not responsibly produce his text messages, and therefore, his failure was not substantially justified. Nor does the Court believe an award of expenses and costs for only these two litigation efforts would be unjust. If Plaintiff had diligently searched for all responsive text messages when Defendants first raised their concerns—or at least after concerns with the February 12 production arose—Defendants would not have been forced to further investigate the accuracy of Plaintiff's production and file the instant motion. Defendants inquired whether Plaintiff would agree to reimage his device and even raised the possibility of paying the reimaging costs. (*See* ECF No. 160-2 ¶ 4.) Plaintiff, however, only agreed to reimage his device after Defendants filed the instant motion for sanctions. Accordingly, Defendants are entitled to monetary sanctions pursuant to Rule 37(b)(2)(C) for the reasonable expenses and attorneys' fees incurred from meet and confer efforts after the February 12, 2019 production and bringing the instant sanctions motion. Defendants' request for sanctions related to these two litigation efforts is therefore **GRANTED**.

With respect to expenses and fees related to the Verizon Motion, the Court need not definitively determine whether the Verizon Motion was caused by Plaintiff's noncompliance because the Court finds that an award of those fees and expenses would be unjust under the circumstances. In its Verizon Order, the Court found that Defendants had met the requisite diligence and excusable neglect standards necessary to reopen discovery. (*See* ECF No. 161 at 10–11.) However, it is also true that Defendants could have subpoenaed Verizon for Plaintiff's text message logs at any time prior to the close of discovery, but in their discretion chose not to. As Defendants themselves highlight in the instant motion, they first raised concerns about Plaintiff's failure to produce one-on-one

---

have had to review the documents in these productions regardless of Plaintiff's failure to comply. Thus, these litigation efforts were not directly caused by Plaintiff's noncompliance, and the Court declines to include them under Rule 37(b)(2)(C).

16-cv-02922-BTM-JLB

text messages with specific individuals in August 2018 (ECF No. 165 at 5), and discovery in this case did not close until December 21, 2018 (ECF No. 126 ¶ 1). Plaintiff's deficient February 12, 2019 production may have been the tipping point that caused Defendants to seek Plaintiff's text message logs, but nothing prevented Defendants from issuing a subpoena on Verizon before the close of discovery. Had they done so, there would have been no need for the Verizon Motion. The Court therefore finds that an award of fees related to the Verizon Motion would be unjust under the circumstances. Defendants' request for fees and expenses related to the Verizon Motion is therefore **DENIED**.

### b. Additional Monetary Sanctions

The Court then turns to whether Plaintiff should be required to pay the additional monetary sanctions not specifically mandated by Rule 37(b)(2)(C) but requested by Defendants. Defendants argue, and the Court agrees, that Plaintiff's intent in violating the Court's Order is immaterial to determining whether sanctions are appropriate *ab initio*. There is no question that Defendants have spent ample time and resources demonstrating that Plaintiff's text message production is deficient. However, Plaintiff's lack of bad faith is pertinent to determining the severity of the sanctions the Court may justly impose.

Plaintiff claims that "there has never been any intent to avoid this Court's orders, deprive the other side of discoverable information, or any indicia of bad faith," and despite Defendants' urging otherwise, the Court has no present reason to disbelieve Plaintiff's assertions. (ECF No. 162 at 2.) Although Plaintiff undeniably did not comply with this Court's Order by failing to produce all responsive text messages, his noncompliance can be attributed to technological difficulties aggravated by a lack of diligence. Nor does the Court find that Plaintiff purposefully "mashed together text messages from other devices to create a misleading production," as Defendants insist. (ECF No. 160 at 9.) Plaintiff has voluntarily agreed to pay the expenses associated with reimaging his device and remedying his noncompliance. Therefore, the Court finds that it would be unjust to order Plaintiff to pay any additional fees or expenses as a monetary sanction. The Court also declines to

16-cv-02922-BTM-JLB

find that additional monetary sanctions would be appropriate pursuant to its inherent power to sanction Plaintiff for violation of the Court's Order.

Accordingly, Defendants' request for expenses and fees incurred by (1) reviewing Plaintiff's January 4 and February 12 productions and (2) meeting and conferring on the January 4 production are **DENIED**.

### III.   <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion for Sanctions (ECF No. 160) is **GRANTED in part and DENIED in part**.  Accordingly, the Court hereby **ORDERS**:

1.   Plaintiff shall, at his expense, have Aptegra Consulting[13] create a new image of his cell phone.  The parties shall meet and confer to identify a mutually-agreeable plan for the reimaging of Plaintiff's cell phone, including the manner and format in which responsive text messages will be produced.

2.   On or before **<u>July 12, 2019</u>**, Defendants shall provide Plaintiff with a detailed fee and cost invoice(s) supporting the amount of reasonable attorneys' fees and costs incurred by Defendants relating only to:

   a.   meet and confer efforts after the February 12, 2019 production and before the filing of the instant motion; and

   b.   the instant sanctions motion.

The parties shall promptly and thoroughly, and no later than **<u>August 2, 2019</u>**, meet and confer over any disputed fees and costs incurred by Defendants.  If the parties are able to resolve any disputes with respect to the amount of reasonable attorneys' fees and costs, Plaintiff is to pay that amount no later than **<u>August 16, 2019</u>**. If the parties are unable to resolve their dispute(s) through the meet and confer process, then Defendants are granted leave to file, on or before **<u>August 16, 2019</u>**, an *ex parte* motion supported by sufficient

---

[13] If Plaintiff no longer wishes to employ Aptegra Consulting to reimage his cell phone, the parties may meet and confer and agree to a different neutral, third-party vendor.

evidence in support of the amount of reasonable fees or costs owed by Plaintiff to Defendants in connection with this motion. The deadline for Plaintiff to file an opposition to Defendants' motion for fees and costs, if any, shall be **August 30, 2019**.

**IT IS SO ORDERED.**

Dated: June 14, 2019

Hon. Jill L. Burkhardt
United States Magistrate Judge

16-cv-02922-BTM-JLB